FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2014 AUG 18 PM 4: 24

CLERK __C Adams__
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

LENA WILLIAMS, individually and &ast;
as administrator of the Estate &ast;
of Melvin Williams, Deceased, &ast;
&ast;
  Plaintiff, &ast;
&ast;
   v. &ast;   CV 311-061
&ast;
JEFFERY DEAL, in his individual &ast;
capacity as a Police Officer of &ast;
the City of East Dublin, WILLIAM &ast;
LUECKE, in his individual capacity &ast;
as Chief of Police of the City of &ast;
East Dublin, and CITY OF EAST &ast;
DUBLIN, a municipal corporation &ast;
of Georgia, &ast;
&ast;
  Defendants. &ast;

---

**O R D E R**

---

Presently pending before the Court is Defendants' Motion for Summary Judgment. Upon review of the parties' briefs, the relevant case law, and the evidence of record, the motion is **GRANTED IN PART** and **DENIED IN PART** for the following reasons.

## I. BACKGROUND

### A. Factual Background

This case arises from the lethal shooting of Melvin Williams ("Williams") by Jeffery Deal ("Deal"), an employee of

the East Dublin Police Department ("EDPD"), following a traffic stop and altercation on May 14, 2010. A portion of the incident was captured on video by a dashboard camera mounted on Deal's vehicle. At summary judgment, a district court should adopt facts consistent with video evidence and disregard facts that are "clearly contradicted" by the video, where – as here – there is no indication that the video was doctored, altered, or otherwise distorts the facts. Scott v. Harris, 550 U.S. 372, 378-81 (2007). Thus, for ease of reference, the Court presents a factual summary of the incident with the undisputed video evidence isolated in its own section.[1]

### 1. Events Prior to Activation of Dashboard Camera Video

According to Deal, he observed a car fail to stop at a stop sign at the intersection of Boat Ramp Road and Buckeye Road, at 9:00 a.m. or shortly thereafter on May 14, 2010. (Doc. No. 120, Deal Dep. at 151-52, 155, 172.) At that time, Deal was parked in a marked police vehicle one block north on Buckeye Road at the Amba Food Mart.[2] (Id. at 151.) Williams

[1] The Court notes here that the record was not completed, i.e., principle depositions were not taken and key evidence was not produced, until after a virtually frivolous appeal by Defendants of discovery issues.

[2] Throughout this subsection, the Court takes judicial notice of directional headings and approximate distances. See Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997) (noting that courts routinely take judicial

turned right (south) onto Buckeye Road and sped away from Deal. (Id. at 152, 154.) Deal accelerated after him, but did not turn on his emergency lights or sirens or call dispatch. (Id. at 152-55, 159-60, 168-69.) After driving one block south on Buckeye Road, Williams turned left onto Daley Street. (Id. at 154.) When Deal reached Daley Street, he apparently saw Williams turning right onto Marion Street. (Id. at 156.) Deal continued south on Buckeye Road and parallel to Williams's route on Marion Street. (Id. at 156-57.) While driving parallel to Williams, Deal apparently caught a glimpse of Williams's vehicle as they both simultaneously reached Roberson Lane, which runs perpendicular between Buckeye and Marion. (Id. at 157-58, 162-63.) Deal saw Williams either continue south on Marion or turn right on Roberson.[3] (Id.; Doc. No. 125, Ex. 12 "GBI Interview" at 8:45 to 9:15.) At that point, Deal continued south on Buckeye and turned right on Derriso Lane, which was away from the route being taken by Williams. (Deal Dep. at 157.) Deal thought he would have a good vantage point from Derriso Lane. (Id. at 163.) Deal

---

notice of matters of geography pursuant to Federal Rule of Evidence 201); e.g., United States v. Proch, 637 F.3d 1262, 1266 (11th Cir. 2011) (taking judicial notice of map of subject area). Additionally, a map is included in the record, though it is inverted with the southernmost point on the top of the map. (See Deal Dep., Ex. 1 at 85.)

[3] This factual issue is immaterial.

proceeded down Derriso Lane and turned around. (Id. at 164-68.)

## 2. Dashboard Camera Video[4]

At 9:06:01 a.m., Deal turned around in the yard of a residential lot on Derriso Lane, drove about 200 feet toward Buckeye Road, and turned left (north) on Buckeye Road. As soon as Deal turned left onto Buckeye Road, Williams's vehicle was visible heading north on Buckeye Road and immediately pulled into a driveway about 100 yards away. Deal drove toward Williams and turned on his emergency lights as he pulled behind Williams's vehicle in the driveway. (Video at 9:06:01 to 9:06:34.)

Deal immediately exited his vehicle and, with his hand on his holster, ran toward the driver-side of Williams's vehicle. (Id. at 9:06:35.) Much of the ensuing scene is outside the view of the dashboard camera, but the audio is still captured. (Id. at 9:06:36 to 9:07:00.) Deal immediately stated, "Get in the car. Don't get out the car on a traffic stop." The audio then begins to capture sounds of a physical struggle. After several seconds of struggle, Williams exclaimed: "What is wrong with you!" Deal, apparently trying to make a radio

---

[4] The recording from the dashboard camera on Deal's vehicle is filed as a compact disc (doc. no. 125, ex. 5) and will hereinafter be cited as "Video" with applicable time markers. As a result of how the dashboard camera is programmed, the saved portion of the video begins thirty seconds before activation of the emergency lights. (Deal Dep. at 157, 164.)

dispatch, stated "1018 Buckeye." Williams exclaimed again: "Man, what is wrong with you!" Briefly, the sounds of struggle continued. (Id.)

Then, they both enter the view of the dashboard camera. (Id. at 9:07:01.) At that time, Deal was slightly hunched over with both hands on the holster-side of his body near his firearm, and Williams appeared to be pulling or grabbing at Deal around his upper torso. Williams threw and landed a close-fisted punch at Deal's head.[5] Deal immediately backed away and out of the view of the camera. Still facing Deal, Williams paused and then stepped forward toward Deal. As soon as Williams advanced a step forward, Deal fired a shot, and Williams fell to the ground. (Id. at 9:07:04.) Deal then loudly commanded, "Get on the ground!" (Id. at 9:07:05.) The entire fight lasted just under thirty seconds. (Id. at 9:06:37 to 9:07:05.)

Deal immediately radioed dispatch.[6] Williams struggled to lift his head off the ground. Deal stated, "Stay on the ground." Someone – later identified as Keith Patterson, an

---

[5] Utilizing the "Frame Advance" button to perform a frame-by-frame review, the video reveals that Deal's sunglasses were knocked off of his head by Williams's punch. During the subsequent investigation, the GBI found a broken set of sunglasses at the scene and observed an abrasion or contusion above Deal's left eye. (Doc. No. 46, Ex. 3 at 66-67, 91.)

[6] Deal informs dispatch: "I just shot one. 1018 Buckeye, right here. 418 Buckeye. Had one try to take my gun. 418 Buckeye." (Video at 9:07:06 to 9:07:20).

eye-witness – yelled toward Deal from Buckeye Road, and Deal responded, "I'm all right, man. Thank you, brother. Yes sir, thank you." Deal continued pointing his firearm at Williams and commanded: "Stay on the ground . . . Put your hands out." At that point, Williams was clearly incapacitated, laid his head on the ground, and ceased moving. Deal continued to speak with dispatch. Though partially out of the frame, it appears that Deal entered Williams's car and attempted to open the trunk. (Id. at 9:07:06 to 9:09:44.) Other officers and EMTs began to arrive. They were unable to find a pulse on Williams and unsuccessfully attempted to resuscitate him.[7] Officers continued to investigate the scene, and the camera was eventually turned off. (Id. at 9:09:45 to 9:49:00.)

### 3. Deal's Statements

Deal has made several statements regarding the incident.[8] First, Deal repeatedly explained the traffic stop, fight, and shooting to other officers arriving at the scene, as captured by the dashboard camera microphones. Second, on the day of the incident, Deal was interviewed by GBI agent Jerry Jones. Third, Deal wrote an incident report on the day of the

---

[7] The autopsy report revealed that the bullet pierced Williams's left lung, heart, and right lung, and thus caused his death. (Doc. No. 127, Ex. 17.) There were also minor contusions and abrasions on Williams's fingers, wrist, legs, and cheek, consistent with minor blunt force injuries sustained during the fight. (Id.)

[8] Here, the Court focuses on what Deal has stated regarding the off-camera portion of the incident.

incident.[9]  Lastly, about two years after the incident, Deal was deposed and submitted a sworn declaration.  After resolving conflicts and inconsistencies in favor of Williams, Deal's statements reveal the following.

After pulling into the driveway, Deal saw Williams remove his seat belt, open the door, and jump out as if he was going to flee.  (Video at 9:10:00 to 9:10:20, 9:11:40 to 9:11:50; GBI Interview at 9:40 to 11:00; Deal Dep. at 58.)  Deal could see that Williams did not have a weapon in his hands.  (Deal Dep. at 139, 146.)  As shown on the video, Deal rushed toward Williams and commanded him to get in the car.  Deal gave Williams only a brief moment to obey the command.  (Deal Dep. at 208, 210, 225; Video at 9:06:35 to 9:06:45.)  Then, Deal grabbed Williams and tried to push him back into the vehicle.[10]

_____

[9] During discovery, Defendants produced an incident report dated May 19, 2010.  (See Deal Dep., Ex. 4.)  The incident report's narrative is a brief paragraph.  At his deposition, Deal testified that, on the day of the incident, he wrote a thorough, two-page narrative in his incident report.  (Deal Dep. at 67, 77.)  Deal claims he "[does not] know what happened" to the original report and could not identify where the original report is located.  (Id. at 67, 71.)  Deal does not recall what he wrote in the original report.  (Id. at 71.)  Chief Luecke and Deal explained that someone in the EDPD may have removed information from the original report because the GBI instructed Chief Luecke that it contained too much information to be released to the media.  (See Deal Dep. at 67-71, 75-77; Doc. No. 122, Luecke Dep. at 107, 109-11, 115, 127-28, 130.)

Plaintiff has filed a motion for sanctions based upon the alleged spoliation of evidence related to this incident report.  The Court defers ruling on the motion to a later time.

[10] On other occasions, Deal stated that Williams was the first to initiate physical contact.  (GBI Interview at 11:20 to 11:50; Deal Dep. at 175-76 & Ex. 4; Doc. No. 129, Deal Decl. ¶ 9.)  The Court resolves this factual dispute in favor of Plaintiff.

(Video at 9:10:00 to 9:10:20, 9:11:40 to 9:11:50, 9:16:50 to 9:17:00; Deal Dep. at 56.) Deal grabbed and pushed Williams "in case he was going to try to fight or run."[11] (Deal Dep. at 146.)

At that point, Deal and Williams quickly got "tied up," and a vigorous fight began. (GBI Interview at 11:00 to 13:00.) Deal and Williams knocked each other over and fought on the ground. (Id.) As they wrestled and got back on their feet, Williams hit Deal in the head a couple times with closed fists, and Deal responded with some knee strikes.[12] (Id.; Video at 9:11:40 to 9:11:50, 9:16:50 to 9:17:05; Deal Dep. at

_____

[11] At some point prior to the altercation and shooting, either when he observed the stop sign violation or when he saw the driver exit the vehicle, Deal recognized Williams. (Deal Dep. at 153-54 & Ex. 4; GBI Interview at 5:50 to 6:15, 8:00 to 8:15.) Deal testified that he thought Williams was dangerous due to "prior knowledge and prior dealings" between the EDPD and Williams. (Deal Dep. at 172.) Prior to the subject incident, Deal had seen Williams's criminal record and was aware that Williams was a convicted felon who had served ten years in prison. (GBI Interview at 7:50 to 8:10; Deal Dep. at 140.) Deal was also aware that, just a few weeks before the subject incident, Williams had made threats of physical violence against another officer of the EDPD. (GBI Interview at 6:45 to 7:30; Deal Dep. at 140; Luecke Dep. at 136-37; Doc. No. 46, Ex. 3 at 87-88.) Deal had also pulled Williams over for two prior traffic violations. (Deal Dep. at 141.) On those occasions, Williams was nonviolent. (Id.)

Additionally, Deal claims he was aware that the EDPD had investigated Williams for domestic violence, firearms theft, and drug activity (GBI Interview at 6:15 to 8:10, 18:55 to 20:15; Deal Dep. at 78, 138, 140-41, 183); however the EDPD has no documentation regarding these investigations (see Luecke Dep. at 135-38). Without further corroboration of these incidents at this time, this particular claimed background knowledge was not considered in resolving the motion.

[12] Consistent with the physical altercation, Deal's uniform was dirty, torn on one pants leg, and a lapel pin had been partially ripped off. (Doc. No. 46, Ex. 3 at 63, 81, 92.) Deal also had abrasions and contusions on his left hand, wrist, and above his left eye. (Id. at 91.)

208.) Deal attempted to get out his pepper spray but was preoccupied blocking Williams. (GBI Interview at 12:50 to 13:00.)

Williams then grabbed Deal's firearm holster and made several violent jerking motions. (GBI Interview at 13:45 to 14:30; Video at 9:12:10 to 9:12:30, 9:17:40 to 9:18:15; Deal Dep. at 217-20; Deal Decl. ¶ 9.) Deal struggled to hold on to his firearm, and the holster unsnapped. (GBI Interview at 13:45 to 14:30; Video at 9:13:40 to 9:13:50, 9:17:10 to 9:18:15; Deal Decl. ¶ 9.) Somehow, Deal knocked Williams's hands off the firearm and, emerging with the gun, backed away, and raised it toward Williams. Then, as soon as Williams started advancing toward him, Deal fired the lethal shot at Williams. (GBI Interview at 14:30 to 15:00; Video at 9:07:00 to 9:07:05, 9:11:25 to 9:11:35, 9:12:10 to 9:12:30, 9:13:40 to 9:13:50, 9:17:10 to 9:18:15.) At the moment Deal fired his weapon, he was approximately six feet away from Williams.[13] (Deal Dep. at 97-103.) Deal has never stated, and the video bears out, that he did not issue any warning to Williams immediately prior to firing his weapon.

---

[13] Admittedly, Deal is "not good with estimating distances." (Deal Dep. at 84.) On previous occasions, Deal claimed to have shot Williams from a closer distance. (GBI Interview at 14:30 to 15:00; Deal Dep. at 97-98.) The Court will use the most favorable distance for Plaintiff (i.e. the farthest distance).

### 4. **Keith Patterson's Account of the Incident**

Keith Patterson was an eye-witness to the incident. (Doc. No. 50, Patterson Decl. ¶ 4.) Patterson was in the passenger seat of a car traveling north on Buckeye Road and observed part of the fight between Williams and Deal. (Id.; see also Doc. No. 47, Ex. 5 "Patterson GBI Interview" at 2:00 to 4:30, 8:50 to 14:30, 18:00 to 18:30; Doc. No. 123, Patterson Dep. at 33-68, 97-99.) During the fight, Patterson saw Williams punching Deal and grabbing and pulling at Deal's firearm.[14] (Patterson Decl. ¶¶ 4-6; Patterson Dep. at 27, 34, 46, 52-53, 97-99; Patterson GBI Interview at 11:00 to 14:30.) Patterson observed Deal and Williams briefly separate and the lethal shot fired as Williams advanced toward Deal.[15] (Patterson Decl. ¶¶ 5-6.)

There is, however, some reason to question Patterson's ability to observe and recount the *entire* incident. The rear-facing camera on Deal's vehicle shows that Patterson may not have witnessed much of the altercation outside of the portion

---

[14] Patterson's accounts varied as to how much control Williams gained over Deal's firearm. The Court will assume that Williams did not remove the gun, even partially, from Deal's holster, because that is the account most favorable to Plaintiff. (See Patterson Dep. at 53-54, 67, 97-99.)

[15] Patterson also claimed to have seen Deal administering CPR on Williams. (Patterson Dep. at 34-35, 39, 56, 59, 105.) The Court disregards this part of Patterson's testimony because it is clearly contradicted by the dashboard video.

captured by the view of the primary camera.[16]   Additionally,

there are a number of facts that detract from Patterson's

credibility.[17]

### 5.   Shawnn Rogers's Account of the Incident

Shawnn Rogers was the driver in the same car as Keith

Patterson and also claims to have witnessed a portion of the

incident.   (Doc. No. 47, Ex. 6 "Rogers GBI Interview" at 3:15

to 3:30; Doc. No. 124, Rogers Dep. at 14, 17-18.)   Rogers saw

Williams hitting and grabbing Deal.   (Rogers GBI Interview at

1:15 to 2:00, 6:45 to 7:45; Rogers Dep. at 9.)  Deal appeared

to be losing the fight.   (Rogers Dep. at 15.)   Rogers thought

that Williams might have been trying to grab Deal's gun, but

he was not sure.   (Rogers GBI Interview at 1:15 to 2:00.)

---

[16] "Camera 2" of the dashboard camera shows the rear view of Deal's vehicle, which is pointed toward Buckeye Road throughout the incident.   At 9:07:04, the exact moment when Deal fires the shot, Camera 2 shows a car briefly pass behind Deal's vehicle.   At 9:07:12, the car reverses back into view and one of its occupants (Patterson or Shawnn Rogers) yells toward Deal.   Based on (1) the time stamp when the car passes Deal's vehicle (as shown in Camera 2), (2) the speed of the car (as shown in Camera 2), and (3) the partially obstructed view of the driveway from the road (as shown by Deal's initial approach from the same direction in Camera 1), one might conclude that Patterson did not view any of the incident prior to 9:07:00.   In other words, Patterson may have only seen a second or two — if any — of the altercation that was not captured by Camera 1.

[17] For example, (1) Patterson drank several beers and shots of liquor before his GBI interview (Patterson Dep. at 20, 25-27); (2) he drank about five 24-ounce beers and ate cherries soaked in corn liquor before his deposition (id. at 7-9); (3) he appears to be a severe alcoholic (id. at 15); (4) he has expressed that he fears testifying in this case due to retaliation from people in Wrightsville (Williams's hometown) (id. at 88-89, 103-05, 108); (5) he is illiterate and disavowed a portion of his declaration which was drafted by defense counsel (id. at 6-7, 78-79, 96-99; doc. no. 138, Dempsey Aff. ¶ 3-4); and (6) his statements are riddled with inconsistencies and incoherencies (see generally Patterson Dep.; Patterson Decl.; Patterson GBI Interview).

Rogers saw Deal trying to get away from Williams. (Id. at 1:15 to 2:00, 6:15 to 6:30; Rogers Dep. at 16.) After Deal managed to get away and draw his weapon, Williams moved toward Deal, and Deal shot Williams. (Rogers GBI Interview at 1:15 to 2:00.) Rogers heard the shot but was not looking at Williams and Deal at that very moment. (Id. at 8:30 to 8:45.) Rogers stopped to ask Deal if he was okay before continuing on. (Id. at 9:20 to 10:40.) Deal appeared to be out of breath. (Id.) Deal signaled that he was fine and Rogers drove away. (Id.)

### 6. The Glass Pipe in Deal's Vehicle

During the GBI investigation, a glass pipe with a burnt end and unknown residue was found in the vehicle being used by Deal on the day of the incident. (Deal Dep. at 184-92 & Exs. 13 & 14.) The pipe was located in an open ashtray in the center console. (See id.) Deal could not explain the presence of the pipe; he states that he must have overlooked it during his vehicle inspection that morning.[18] (See id.) Deal testified that he did not use drugs on the day of the incident or at any time in his life. (Id. at 192-95.) Deal offered to provide the GBI with hair, blood, and urine samples. (Deal Dep. at 192-93.) Indeed, GBI Agent Jerry

---

[18] Deal testified that the vehicle he used that day was the day-shift patrol vehicle - not his usual vehicle. (Deal Dep. at 184-85.)

Jones decided to collect a urine sample on the day of the incident, and the results were negative.[19] (Id.; Doc. No. 46, Ex. 3 at 63-65, 114-15, 129.) The record is relatively silent in regards to any subsequent investigation into the pipe's presence in the vehicle. (See Doc. No. 127, Ex. 15; Luecke Dep. at 84-88.)

### B. Procedural History

On June 17, 2011, Plaintiff Lena Williams filed suit individually and as administrator of the estate of her deceased son, Melvin Williams. On September 16, 2011, Plaintiff filed an Amended Complaint asserting federal and state law claims against Deal and William Luecke, Chief of Police of the City of East Dublin Police Department, and a federal claim against the City of East Dublin. The case was significantly delayed by ill-conceived defense tactics, including numerous discovery disputes, motions, and an unsuccessful appeal. On September 27, 2013, the Court terminated four pending motions for summary judgment due to the "hopelessly labrynthine" state of the docket and permitted the parties to revise and refile consolidated motions for summary judgment. (Doc. No. 175.) Thereafter, Defendants filed the presently pending motion for summary judgment.

---

[19] There was a delay of almost three weeks between collecting and testing the urine sample. (Doc. No. 46, Ex. 3 at 114-15.)

Subsequently, the Court denied Plaintiff's motion to amend and deferred ruling on a motion for sanctions. (Doc. Nos. 186, 187.)

## II. **SUMMARY JUDGMENT STANDARD**

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or

14

by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come

15

forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiff notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. No. 177.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

### III. DISCUSSION

#### A.    Federal Claims Against Deal

Section 1983 provides a civil remedy for deprivations of federal rights established elsewhere. Albright v. Oliver, 510 U.S. 266, 271 (1994). "In order to prevail in a civil rights action under section 1983, a plaintiff must make a prima facie showing of two elements: (1) that the act or omission deprived

plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (quotations omitted).

In this case, Plaintiff claims Deal, while acting under color of state law, violated Williams's Fourth Amendment rights by arresting him without probable cause and by using excessive force during the course of the arrest. Plaintiff also claims that Chief Luecke has supervisory liability over the unconstitutional actions of Deal. Finally, Plaintiff sues Chief Luecke and the City of East Dublin for their alleged maintenance of a policy or custom which exhibited deliberate indifference to Williams's constitutional rights.

It should be noted here that there is no dispute that Deal was acting under color of state law during the subject incident. Deal was employed as a police officer by East Dublin. He was patrolling in a marked police vehicle, wearing a police uniform, and carrying a government-issued firearm. Deal conducted himself as a legitimate law enforcement officer at all relevant times.[20]

---

[20] The Court recognizes that Plaintiff has alleged that Deal had lost his police powers at the time of arrest due to a lack of state-mandated

## 1. **Unlawful Arrest**

"The Fourth Amendment's guarantee against unreasonable searches and seizures encompasses the right to be free from arrest without probable cause." Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004). A traffic stop, which is also a seizure within the meaning of the Fourth Amendment, is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion of criminal activity. See Arizona v. Johnson, 555 U.S. 323, 330 (2009); United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009).

> Probable cause to arrest under federal law exists when an arrest is objectively reasonable based on the totality of the circumstances. This standard is met when the facts and circumstances within the *officer's knowledge,* of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003). "Although probable cause requires more than

---

training. Nevertheless, the inquiry into Deal's alleged loss of police powers has no bearing on the analysis of whether Deal unlawfully arrested Williams or used excessive force because a violation of Georgia law governing required police training does not impact the constitutional violation inquiry. "Section 1983 does not create a remedy for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a federal right. There is no federal right not to be arrested in violation of state law." Knight v. Jacobson, 300 F.3d 1272, 1276 (11th Cir. 2002) (citation omitted); accord Mazuch v. Rosier, No. 3:08-cv-018, 2010 WL 724111, at *8 (S.D. Ga. Mar. 2, 2010) (Section 1983 "is not concerned with a violation of state law/policies.").

suspicion, it does not require convincing proof and need not reach the same standard of conclusiveness and probability as the facts necessary to support a conviction." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (citation omitted). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (holding that custodial arrest for seatbelt violation was constitutional).

"Whether a particular set of facts gives rise to probable cause to justify an arrest for a particular crime depends, of course, on the elements of the crime." Crosby, 394 F.3d at 1333. Here, the particular crime at issue is failing to stop at a stop sign. Under O.C.G.A. § 40-6-72(b), "every driver of a vehicle approaching a stop sign shall stop at a clearly marked stop line," except when directed to proceed by a police officer. On the day of the incident, Deal related that he saw Williams fail to properly stop at the stop sign at Boat Ramp Road and Buckeye Road. (GBI Interview at 8:00 to 8:45.) At his deposition, Deal testified that there is a white line adjacent to this particular stop sign and he "observed the vehicle go pretty much all the way past the white line. And when he looked over at me, he kind of slammed on [the] brakes

almost out into the roadway." (Deal Dep. at 152.) Based on this evidence, Deal had probable cause to perform the traffic stop.

A plaintiff asserting a claim for unlawful arrest bears the burden of showing an absence of probable cause. See Rankin v. Evans, 133 F.3d 1425, 1436 (11th Cir. 1998). Here, Plaintiff argues there was no probable cause because Deal did not activate his emergency lights or communicate with dispatch immediately after seeing the traffic violation and the violation was not captured by the dashboard camera. These circumstances, however, are irrelevant to the inquiry of whether there was probable cause to support the traffic stop. That is, the failures to turn on the lights immediately, radio dispatch immediately, or record the pursuit of Williams's vehicle do not negate Deal's account of what he witnessed, i.e., a stop sign violation. Stated another way, Plaintiff has presented no evidence to contradict Deal's direct, sworn testimony about the traffic violation; thus, a rational juror could not conclude that Deal's account of the stop sign violation and subsequent pursuit was fabricated. See Rodriguez v. Farrell, 280 F.3d 1341, 1352 n.20 (11th Cir. 2002) (finding only conjecture where plaintiff's circumstantial evidence was "not inconsistent" with officer's direct, sworn testimony); Garczynski v. Bradshaw, 573 F.3d

1158, 1165 (11th Cir. 2009) ("A genuine dispute requires more than some metaphysical doubt as to the material facts. A 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." (citation omitted)).

In conclusion, Deal did not violate the Constitution by initiating the traffic stop. Deal has also stated that Williams was not wearing a seat belt and performed an illegal U-turn. Because there is no genuine dispute of fact regarding probable cause for the stop sign violation, it is unnecessary to determine whether there was additional justification to stop Williams. Accordingly, summary judgment is **GRANTED** in favor of Deal as to the federal claim for unlawful arrest.

### 2. **Excessive Force**

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." McCormick, 333 F.3d at 1244. To determine whether a use of force exceeds constitutional thresholds, the question is one of reasonableness. Graham v. Conner, 490 U.S. 386, 396 (1989). Because the reasonableness test is "not capable of precise definition or mechanical application," district courts must give careful attention to the totality of the circumstances, including "the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. Other relevant factors may include the extent of the injury inflicted, the duration of the incident, whether the action takes place in the context of affecting an arrest, and the number of persons and police officers at the scene. Jackson v. Sauls, 206 F.3d 1156, 1170 n.18 (11th Cir. 2000).

The question is whether the officer's actions are objectively reasonable without regard to his underlying intent or motivation. Graham, 490 U.S. at 397. Whether an officer's conduct is objectively reasonable "must be evaluated from the perspective of a reasonable officer possessing the same particularized information as the subject officer." Penley v. Eslinger, 605 F.3d 843, 852 (11th Cir. 2010) (citation omitted). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Id. at 396-97.

Additionally, the Supreme Court and Eleventh Circuit have explained some specific considerations applicable to deadly force cases. The use of deadly force is more likely to be reasonable if:

(1) the suspect poses an immediate threat of serious physical harm to officers or others;

(2) the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and

(3) the officers either issued a warning or could not feasibly have done so before using deadly force.

Penley, 605 F.3d at 850 (citing Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)). However, none of these are rigid preconditions to the lawful application of deadly force by an officer seizing a suspect. Id. (citing Scott v. Harris, 550 U.S. 372, 382 (2007)). Often, deadly force cases turn on the first factor, the presence of an imminent threat of serious physical harm to officers or others. See, e.g., id. at 851; Garczynski, 573 F.3d at 1168. This factor can be reduced to a single question: "whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." Pace v. Capobianco, 283 F.3d 1275, 1281 (11th Cir. 2002). Under the circumstances of this case, the Court finds a genuine issue of material fact on this

first factor as well as the third factor, precluding summary judgment.[21]

Contrary to many situations, the existence of a video depicting the incident does not clearly answer the calculus of excessive force because it is only a partial story. In fact, the most salient factors that go into the calculus are those not appearing on the video. Viewing the evidence in the light most favorable to Plaintiff's claim of excessive force, the Court finds as follows. Immediately upon pulling in behind Williams's car *for a minor traffic violation*, Deal aggressively approached an unarmed Williams with his hand on his holstered firearm. The video does not show what Williams was doing at the same time, i.e., was he attempting to flee, posing a threat, or simply getting out of his car? Then Deal tried to force or push Williams back into the car-though this is not on camera.[22] While Williams questioned Deal's actions,

---

[21] The second factor mitigates in favor of Plaintiff in that Williams had not committed a serious crime such that his apprehension was critical.

[22] The apparent rashness of Deal's initial conduct is troubling. As other courts have warned, "Defendants cannot claim the protection of qualified immunity when their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force." Swofford v. Eslinger, 671 F. Supp. 2d 1289 (M.D. Fla. 2009) (quoted source omitted), cited in Ayers v. Harrison, No. 2:10-CV-32, 2012 WL 529946, at *6 (N.D. Ga. Feb. 17, 2012); see also Tennessee v. Garner, 471 U.S. at 8-9 (instructing courts to look to the totality of the circumstances to determine whether the force used was reasonable). Thus, Deal's conduct leading up to his deadly use of force is relevant to the reasonableness inquiry, particularly where, as here, only thirty seconds elapsed between the initial stop and the fatal shot. For this reason, the Court declines

asking "what is wrong with you," a fight ensued between them,
most of which is also off-camera. When the two men reentered
the camera frame, Williams could be seen throwing a punch at
Deal's head while Deal had both hands on his holstered
firearm. It is unclear whether Deal was protecting his
firearm from being grabbed or trying to withdraw his weapon
for protection and/or use.[23] Then, Deal is able to gain a
momentary separation from Williams and draw his firearm.[24]
However, because Deal again backs off camera, it cannot be
established how far away Deal was able to get from Williams.
While the Court may accept that the distance between the men
was six feet when Deal fired the fatal shot,[25] importantly, the
question of how far away Deal *could* have backed away before
needing to fire his weapon remains an open one. The question
of whether it was feasible for Deal to have issued a warning
prior to firing is also an integral one of fact for jury
determination. That is, viewed in the light most favorable to

to consider Deal's first application of force-the off-camera pushing at
the car door-separate and distinct from the second and fatal application
of force-the shooting thirty seconds later.

[23] Any discrepancy that exists over the degree of control Williams
obtained over Deal's firearm is not immaterial. Indeed, given the serious
credibility issues confronting Defendants' primary witness on this point,
see Section I.a.4, *supra*, there exists a question of fact whether Williams
even attempted to grab Deal's firearm.

[24] There is evidence that Deal had pepper spray on his person, but
he did not use it. The choice of using his firearm rather than an
intermediate weapon may play into the reasonableness calculus.

[25] See footnote 13, *supra*.

Plaintiff, the record, particularly the video, would support a finding that Deal acted too hastily in discharging his firearm without any warning. Finally, the ultimate question of whether Deal reasonably feared for his safety is a question of fact when so much of the incident does not appear on camera.

In short, at the moment Deal decided to use deadly force, there are genuine issues of material fact as to whether a reasonable officer in his position would have perceived the situation as *gravely* dangerous and whether shooting Williams was reasonable in light of the circumstances. Consequently, Plaintiff's federal claim of excessive force must go to a jury, and summary judgment on this claim is **DENIED**.

### 3. Qualified Immunity

Defendant Deal contends that even if he committed a constitutional violation, he is entitled to qualified immunity on the excessive force claim. Qualified immunity protects government officials performing discretionary functions from being sued in their individual capacities. Wilson v. Layne, 526 U.S. 603, 609 (1999). Public officials are shielded under qualified immunity so far as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is a

question of law for the court. Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

The Eleventh Circuit utilizes a two-part analysis for the defense of qualified immunity. First, the defendant official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Hartsfield v. Lemacks, 50 F.3d 950, 953 (11th Cir. 1995). If the defendant meets this burden, the plaintiff must then demonstrate that the defendant violated clearly established law based upon objective standards. Id.

   a.   Discretionary Authority

Plaintiff argues that Deal was not acting within the scope of his discretionary authority when he used deadly force against Williams because Deal had not completed use of deadly force training ("UODF training") mandated by Georgia law and therefore had lost his police powers. Pursuant to Georgia statutory authority, police officers are required to complete annual firearms training on "the Constitutional and legal limitations on the use of deadly force" and "the agency's policies regarding the use of deadly force" as part of their twenty-hour annual training requirement. See O.C.G.A. §§ 35-8-21(a), 35-8-7(16); Ga. Comp. R. & Regs. 464-5-.03.1(b). The Georgia Peace Officer Standards and Training Council ("POST") has statutory authority to approve and recognize such

27

training. O.C.G.A. § 35-8-21(b). According to POST's "Rule of Firearms Requalification," effective January 1, 2006, an officer must attend a minimum of one hour of UODF training each calendar year. (Doc. No. 127, Ex. 11.)

Importantly, failure to complete the annual training results in the loss of an officer's power of arrest and general police powers. See O.C.G.A. § 35-8-21(d) ("Any peace officer who does not fulfill the training requirements of this Code section shall lose his or her power of arrest."); id. § 35-8-17(a) ("Any peace officer so employed who does not comply with this chapter shall not be authorized to exercise the powers of a law enforcement officer generally and particularly shall not be authorized to exercise the power of arrest."); Ga. Comp. R. & Regs. 464-5-.03.1(b). An officer who fails to complete his training hours is "relegated to the status of a private citizen" who is authorized to effect an arrest only pursuant to Georgia's citizen's arrest statute. State v. Pinckney, 255 Ga. App. 692, 694 (2002).

As shown by Deal's POST training profile – dated August 12, 2010 – Deal completed a basic law enforcement training course and four hours of firearms requalification and UODF training in 2007. (Deal Dep., Ex. 2.) On December 8, 2008,

Deal completed four hours of only firearms requalification.[26] (Id.) On December 8, 2009, Deal completed one hour of firearms requalification but no UODF training.[27] (Id.) Because Deal did not complete sufficient UODF training in 2008 and 2009, he lost his authority to exercise law enforcement powers. See O.C.G.A. § 35-8-17(a).

At some point in December 2009, Deal recognized that he had a UODF training deficiency on his POST profile, and, in February 2010, Deal completed one hour of make-up UODF training. (Deal Dep. at 37 & Ex. 2; Deal Decl. ¶ 16; Doc. No. 46, Ex. 1; Deal's POST Interview.) However, Deal did not send a waiver request to POST at that time. On the day of the subject incident, May 14, 2010, Deal believed that his

---

[26] Though it is not noted on his training profile, Deal claims that the December 2008 training included some UODF training, but he does not recall how much time they spent covering UODF material. (Deal Dep. at 46; see also Doc. No. 125, Ex. 1 "Deal's POST Interview.") According to Chief Luecke, the December 2008 training actually consisted of 2.5 total hours of firearms requalification, of which only 45 minutes was spent on UODF training. (Luecke Dep. at 62, 103-04.) Chief Luecke believed that it was not necessary to do a full hour of UODF training, as mandated by POST. (Id. at 62-64.) Deal also "felt like" he should receive credit for more hours of training than he actually performed, as long as he covered the materials. (Deal Dep. at 18-22, 29-30.) Chief Luecke also testified that his officers were not paying attention to the UODF training. (Luecke Dep. at 76.) There are also factual inconsistencies as to (1) who was the instructor during the training, and (2) what time of day the training took place. (See Deal Dep. at 45-46; Deal's POST Interview; Luecke Dep., Ex. 15.)

[27] Deal and Chief Luecke confirm that there was firearms training on December 8, 2009. (Deal Dep. at 15, 49-50; Deal Decl. ¶ 15; Luecke Dep. at 88.) Chief Luecke also confirms that there was no UODF training in 2009. (Luecke Dep. at 88, 94.) Deal, however, "felt like" he also did UODF training, but does not actually remember the training. (Deal Dep. at 16-29, 130.) While the instructor on December 8, 2009, was Richard Brantley, Deal did not remember ever being instructed on UODF by Richard Brantley. (Deal Dep. at 49; Luecke Dep. at 88; Deal's POST Interview.)

training was up to date and that his police powers were intact.    (Deal Decl. ¶ 18.)    However, according to 2011 correspondence by the Director of POST's Certification and Training Division: (1) Deal's POST profile did not show any UODF training in 2008 and 2009; (2) therefore, Deal lost his official power of arrest on January 1, 2009; and (3) Deal's authority to arrest had not been reinstated as of July 2011. (Doc. No. 127, Ex. 7; Doc. No. 39, Ex. 1.)    The Court likewise concludes that, at the time of the lethal shooting of Williams, Deal's police powers were lost and had not been reinstated.[28]

As previously stated, the initial burden is on Deal to show that he was acting within the scope of his discretionary authority during the subject incident. Discretionary authority includes "all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Roberts v. Spielman, 643 F.3d 899, 903 (11th Cir. 2011) (citation omitted); see

---

[28]    Some time after Plaintiff filed this suit, Defendants submitted waiver request forms to POST for Deal and other officers' 2008 and 2009 UODF training deficiencies.    (See Deal Dep., Ex. 9; Luecke Dep., Ex. 8; Deal's POST Interview.)    POST has since recognized the February 2010 makeup training and entered a waiver for the 2009 training deficiency, as reflected on Deal's updated POST training profile.    (Deal Decl. ¶ 16; Doc. No. 46, Ex. 1.)    Deal, however, has presented no authority showing that the POST waiver has any retroactive effect.    Here, the Court evaluates the scope of the officer's authority "when the allegedly unconstitutional acts took place."    Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003).

*also* Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) ("A government official acts within his discretionary authority if he was (a) performing a job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."). "A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds." Holloman, 370 F.3d at 1264 (citations omitted).

An attempt to investigate crime and effectuate an arrest generally falls within a police officer's duties. Thus, the first prong is met in this case. See id. at 1266. However, whether Deal's traffic stop and use of force were "within the scope of his authority" is a legitimately contested issue.

To determine whether a government official acted within the scope of his authority, courts routinely look to state law to gauge the scope of authority granted to that official. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1283 (11th Cir. 1998) (looking to Alabama statutes to define scope of authority of transportation official); Lenz v. Winburn, 51 F.3d 1540, 1546 (11th Cir. 1995) (referring to Florida statutes to decide scope of authority of guardian ad litem); A.M. v. Grant, 889 F. Supp. 1495, 1508 (M.D. Ala. 1995) ("In light of the Eleventh Circuit's guidance in Lenz, this court turns to the laws and policies of the State of Alabama to

determine whether [a probation officer] was acting within the scope of her discretionary authority."); Mehta v. Foskey, 877 F. Supp. 2d 1367, 1373 n.4 (S.D. Ga. 2012) (referring to Georgia statute "defining peace officers as individuals who have the power of arrest and the power to investigate and detect crime" in concluding that officers were acting within the scope of their authority).

In this case, according to Georgia statutes, Deal did not have authority to effectuate arrests or use deadly force as a police officer at the time of the incident. Therefore, Deal was not acting within the scope of his authority when he performed a traffic stop and used deadly force against Williams. Indeed, Deal's loss of his police powers is analogous to an officer acting outside of his jurisdiction, which can cause an officer to lose qualified immunity. Cf. Jones v. City of Atlanta, 192 F. Appx. 894, 898 (11th Cir. 2006) (holding that police officers who used force outside of their jurisdiction were not acting within their discretionary authority); Ball v. City of Coral Gables, 301 F. Appx. 865, 867 (11th Cir. 2008) (looking to Florida law to determine if police officer had power to arrest outside of his jurisdiction); Peterson v. Crawford, No. 1:06-CV-51, 2007 WL 2908220, at *6 (M.D. Ga. Sept. 28, 2007) (School police officer who did not have authority to make off-campus arrest

"cannot be a private citizen acting under O.C.G.A. § 17-4-60 [citizen's arrest statute] and invoke the defense of a government actor, *i.e.,* qualified immunity."), rev'd in part on other grounds, 268 F. Appx. 879 (11th Cir. 2008). Here, because Deal had lost his police powers, he cannot "invoke the defense of a government actor, i.e. qualified immunity." See Peterson, 2007 WL 2908220, at *6.

The Court recognizes that the only federal case directly on point in this Circuit contravenes this result. In Ayers v. Harrison, No. 2:10-CV-32, 2012 WL 529946, at *8-9 (N.D. Ga. Feb. 17, 2012) (Story, J.), the district court found that an officer who failed to complete his UODF training required by Georgia law was acting within his discretionary authority when he killed a suspect in the course of an investigation. The district court recognized that the officer was "relegated to the status of a private citizen" under Georgia law, but nevertheless concluded that the officer was acting within the scope of his authority. See id. at *9 ("While the *per se* phrasing of this prong might lead one to believe that Harrison could not have completed a discretionary act — because he was not 'authorized' under state law to have general law enforcement powers — the Court finds that, when looking at dicta which elaborates on this standard, the Eleventh Circuit would find Harrison completed a discretionary act when he

killed Ayers."). The district court later concluded that the officer was not entitled to qualified immunity because he violated clearly established law on the use of deadly force.[29] Id. at *10.

This Court, however, is unpersuaded by Ayers. In Ayers, the district court reasoned that the officer, who had lost his police powers, was not acting entirely on his own behalf in conducting an investigatory stop nor had he taken on duties which are not lawfully given to police officers. Thus, he was acting within the scope of his authority. This reasoning, however, conflates the two prongs of the discretionary authority inquiry because it is under the first prong, whether the officer was performing a job-related function, that the conduct or task performed by the police officer is relevant. The second prong examines the authority of the officer, not his conduct. The Ayers district court also discounted the fact that the officer was no longer a "government official" under state law. Yet, the very purpose of qualified immunity is to protect "government officials." Thus, the relegation of

---

[29] The Eleventh Circuit affirmed that the officer was not entitled to qualified immunity because the fleeing suspect posed no threat of harm to the officer or others and the use of deadly force was thus clearly unreasonable under well-established law. Ayers v. Harrison, 506 Fed. Appx. 883, 884 (11th Cir. 2013). The Eleventh Circuit did not discuss the training issue or whether the officer was acting within his discretionary authority. See id. The Eleventh Circuit reversed the district court on an unrelated issue of supervisory liability. Id. at at 884-85.

an officer without proper training to the status of a private citizen is highly relevant to the shield of qualified immunity.

In short, because Deal had lost his police powers, he was not acting within the scope of his authority as a police officer during the subject incident. Accordingly, Deal has not met his burden to show that he was acting within his discretionary authority, and he is therefore not entitled to qualified immunity.

### b.   Clearly Established Right

Even if Deal had been acting within his discretionary authority when he shot Williams, Plaintiff has been able to make a substantial showing that Deal violated a clearly established right. "'The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Hamilton v. City of Jackson, Ala., 261 F. Appx. 182, 186 (11th Cir. 2008) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

Here, the law was clearly established in May 2010 that police use of excessive force is a constitutional violation. Gilmere v. City of Atlanta, 774 F.2d 1495, 1500-02 (11th Cir. 1985); see Acoff v. Abston, 762 F.2d 1543, 1547 (11th Cir. 1985) (explaining that qualified immunity exists where an

officer (1) believes the suspect poses a threat of serious physical harm to the officer or to others; (2) deadly force is necessary to prevent escape; and (3) the officer must give some warning regarding the possible use of force whenever feasible (citation omitted)). Moreover, in McKinney v. DeKalb Cnty., Ga., 997 F.2d 1440, 1443 (11th Cir. 1993), the Eleventh Circuit held that an officer violates the Fourth Amendment in using deadly force without warning against a non-fleeing, unarmed individual. See also Bell v. City of York, Ala., 2013 WL 1352022 (N.D. Ala. Mar. 29, 2013) (in viewing summary judgment facts in the light most favorable to the plaintiff, finding qualified immunity where unarmed arrestee was merely non-compliant and pushed the officer once).

Moreover, the Eleventh Circuit has articulated a narrow exception to the rule that there must be a case precisely on-point to determine that a clearly established right was violated. The Eleventh Circuit has stated: "When an excessive force plaintiff shows 'that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw,' the official is not entitled to the defense of qualified immunity." Thompson v. City of Birmingham, --- F. Supp. 2d ---, 2014 WL 1043631, *7-8 (N.D. Ala. Mar. 14, 2014)

(quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).

Assuming a jury finds that Williams did not pose a grave risk of harm to Deal or that Deal should have issued a warning to Williams prior to shooting him, Deal's conduct in fatally shooting Williams comes within this narrow exception. Accordingly, even if Deal had discretionary authority to use general police powers, he is not shielded by qualified immunity.

### B. Federal Supervisory and Municipal Liability Claims

Neither supervisory officials, such as Chief Luecke, nor municipalities can be held liable under § 1983 for the unconstitutional acts of their subordinates on a *respondeat superior* theory. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). A supervisor must either personally participate in the alleged unconstitutional conduct[30] or there must be a causal connection between the actions of a supervising official and the alleged constitutional deprivation. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). This causal connection can be established when a supervisor's custom or policy results in deliberate indifference to constitutional

---

[30]    There is no allegation that Chief Luecke somehow participated in the subject incident.

rights. Id. Likewise, to impose § 1983 liability on a municipality, a plaintiff must show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).

In Count IV and V of the Amended Complaint, Plaintiff alleges that Chief Luecke and the City of East Dublin are liable for the alleged unlawful shooting of Williams based upon their custom and practice of allowing officers of the EDPD to serve without their powers of arrest. In Count IV, Plaintiff further alleges that the City of East Dublin is liable for failing to establish "a bona fide and meaningful written policy on the use of deadly force and a general written standard operating and procedures manual to adequately-and continually-guide and train East Dublin police officers . . . on issues regarding the use of deadly force . . . . ."

Plaintiff's claim is essentially one of a failure to train. And here, there is little dispute that Deal and perhaps other officers, including Chief Luecke, did not have the required annual training the use of deadly force. However, liability under these circumstances is not automatic

even if an inadequately trained officer violated a person's constitutional rights. See Gold v. City of Miami, 151 F.3d 1346, 1349 (11th Cir. 1998). The "failure to train in a relevant respect [must amount] to deliberate indifference to the constitutional rights of persons with whom the police come into contact."[31] City of Canton v. Harris, 489 U.S. 378, 379 (1989). "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, such as when there exists a history of abuse by subordinates that has put the supervisor [or city] on notice of the need for corrective measures, and when the failure to train is likely to result in the violation of a constitutional right." Belcher v. City of Foley, 30 F.3d 1390, 1398-99 (11th Cir. 1994) (cited sources omitted). Stated another way, "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." Gold, 151 F.3d at 1351.

As stated, Plaintiff has presented evidence that the officers of the EDPD did not have the required annual training in UODF and that a written policy regarding UODF did not exist

---

[31]    The Eleventh Circuit has explained that this "high standard of proof is intentionally onerous for plaintiffs [because] imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983." Gold, 151 F.3d 1351 n.10.

within the department. Plaintiff's evidence falls short, however, in establishing that the city and Chief Luecke should have been on notice that these inadequacies would result in constitutional violations. Plaintiff has shown neither a pattern or history of deadly force incidents by these officers nor a history of relevant misconduct on the part of Deal. On this point, the Eleventh Circuit has spoken to this issue in a factually similar case. In the previously discussed Ayers decision, the district court denied summary judgment on the plaintiff's failure to train claim against two County Sheriffs who had supervisory authority over an officer who had a known training deficiency in the use of force. Ayers, 2012 WL 529946, at *12-13. The district court reasoned that "adequate training on the use of force is an obvious requirement, and Defendants provided no such training." Id. at *13. On appeal, the Eleventh Circuit reversed this ruling. Ayers, 506 F. Appx. at 884-85. Upon noting that there was no evidence of a history of abuse by officers within the Sheriffs' departments or on the part of the individual officer, the Eleventh Circuit found nothing "that would have notified the sheriffs of the need to provide additional use-of-force training." Id. at 885.

Moreover, this case is not an example of a need to train being "so obvious" to warrant liability without prior

constitutional violations. See City of Canton, 489 U.S. at 390 n.10 (providing the example of a city arming its officers with firearms without any training on the constitutional limitations on the use of deadly force). Here, Deal had received UODF training at the police academy in early 2007 and additional training in October of 2007. He had also received some UODF training in February 2010, three months prior to the shooting. In at least one case, the Eleventh Circuit has found the standard police academy training of an officer adequate so as not to subject the municipality to liability "in the absence of past officer misconduct resulting from lack of training." Cannon v. Taylor, 782 F.2d 947, 951 (11th Cir. 1986). As that court recognized:

> To say that officials took no action to correct certain violations of state law is far from saying that those officials were deliberately indifferent or grossly negligent in respecting citizens' rights or tacitly authorized constitutionally offensive conduct. Simple failure to correct violations of state law does not equate to an indifference to constitutional rights.

Id.

In sum, Plaintiff's evidence in this case is not sufficient to show that any training deficiency in the use of deadly force in the EDPD amounted to deliberate indifference to the constitutional rights of the City of East Dublin's citizens. Accordingly, Defendants' motion for summary

judgment on Plaintiff's federal claims against the City of East Dublin and Chief Luecke is **GRANTED**.

### C. State Law Claims

In addition to the federal claims, Plaintiff asserted several state law claims against Deal and Chief Luecke, solely in their individual capacities, including: negligence, negligence *per se*, false imprisonment, assault and battery, wrongful death, and negligent and intentional infliction of emotional distress. These Defendants claim that they have official immunity against these claims.

Official immunity applies to government officials and employees sued in their individual capacities. "While official immunity does not apply to purely ministerial duties required by law, public officials are immune from individual liability for discretionary acts undertaken in the course of their duties and without willfulness, malice, or corruption." Schmidt v. Adams, 211 Ga. App. 156, 156 (1993).

Here, the Court has already established that for purposes of the subject incident, Deal was no longer a "government official" under state law. Accordingly, he is not entitled to official immunity. With respect to Chief Luecke, however, the training and supervision of police officers is a discretionary function under Georgia law. Middlebrooks v. Bibb Cnty., 261 Ga. App. 382, 386 (2003); Lowe v. Jones Cnty., 231 Ga. App.

372, 373 (1998). Moreover, there is absolutely no evidence in the record to support a finding that Chief Luecke acted with malice. For these reasons, Chief Luecke is immune from any state law claim asserted against him in this case, and he is entitled to summary judgment on these claims.

The Court now turns to the state law claims asserted against Deal. Based upon the briefs of the parties and for the reasons articulated in analyzing Plaintiff's federal claims, the Court concludes that Deal has failed to establish that he is entitled to summary judgment on Plaintiff's state law claims of wrongful death, assault and battery, negligence, negligence *per se*, false imprisonment and negligent infliction of emotional distress. Further, because the record would not support a finding that Deal's conduct was "extreme and outrageous" as that term is contemplated by Georgia law,[32] Plaintiff's claim of intentional infliction of emotional distress is **DISMISSED.**

---

[32] Under Georgia law, a plaintiff must establish that a defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Bowers v. Estep, 204 Ga. App. 615, 618 (1992).

## IV.   CONCLUSION

Based upon the foregoing, Defendants' motion for summary judgment (Doc. No. 176) is **GRANTED IN PART** and **DENIED IN PART**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants City of East Dublin and William Luecke on all claims, and in favor of Defendant Jeffery Deal on Plaintiff's federal claim of false arrest and state law claim of intentional infliction of emotional distress.  This case will proceed to trial in due course on Plaintiff's federal claim of excessive force and remaining state law claims against Defendant Jeffery Deal.

**ORDER ENTERED** at Augusta, Georgia, this _18th_ day of August, 2014.

_____
UNITED STATES DISTRICT JUDGE